UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

NATURAL RESOURCES DEFENSE
COUNCIL, INC.; SIERRA CLUB;
and CENTRAL SIERRA
ENVIRONMENTAL RESOURCE CENTER,

NO. S-05-02590WBS GGH

       Plaintiffs,

v.

MEMORANDUM AND ORDER RE:
CROSS-MOTIONS FOR SUMMARY
JUDGMENT; FEDERAL DEFENDANTS'
MOTION TO STRIKE

UNITED STATES FOREST SERVICE;
and JACK TROYER, in his official
capacity as Regional Forester,
Intermountain Region,

       Defendants.

----oo0oo----

Plaintiffs Natural Resources Defense Counsel ("NRDC"),
Sierra Club, and Central Sierra Environmental Resource Counsel,
("plaintiffs") brought this action against defendants United
States Forest Service ("FS") and Regional Forester Jack Troyer,
("defendants"), challenging defendants' decision to revise the
Bridgeport Ranger District Travel Plan and amend the Toiyabe Land
and Resource Management Plan to provide for snowmobile use in

1

7,000 acres of the 47,000-acre recommended addition to the Hoover Wilderness Area.  Currently pending before the court are plaintiffs' and defendants' cross-motions for summary judgment and defendants' motion to strike.

I.   Factual and Procedural Background

     A.   The Area and Nature of the Project

          The Travel Management Plan of the West Hoover Addition ("Travel Plan") covers a project area that consists of 7,000 acres of the recommended western addition to the Hoover Wilderness Area ("West Hoover Addition").  (AR 1871.)[1]  The West Hoover Addition is comprised of 47,000 acres, including a U-shaped glacial basin, high granite and volcanic peaks, and numerous alpine lakes, streams, forests, and meadows.  (AR 24-25.)  The West Hoover Addition is located in the heart of the Sierra Nevada range, surrounded by Yosemite National Park to the south and the Emigrant and Hoover Wilderness Areas to the east and west, respectively.  (AR 3.)  The Pacific Crest Trial ("PCT"), a National Scenic Trial ("NST"), binds the project area on the south and west.  (AR 1874.)  Yomesmite National Park, Emigrant and Hoover Wilderness Areas, and the PCT are closed to snowmobile use because they are Congressionally-designated wilderness areas ("CDWAs") or NSTs.  See 16 U.S.C. §§ 1131-1136.  The West Hoover Addition is part of the National Forest System lands administered by the Bridgeport Ranger District of the Humboldt-Toiyabe National Forest.  (AR 1871.)

          In 1965, the FS began managing the West Hoover Addition

---

[1]     Citations to the Administrative Record appear as "AR [Bates number]."

as if it was a CDWA and closed the area to motorized use.  (AR 1852.)  Forest Orders from 1980 and 1981 prohibited the use of motorized vehicles, including snowmobiles, throughout the West Hoover Addition.  (AR 35-51.)  The California Wilderness Act of 1984 directed the Secretary of Agriculture to manage the West Hoover Addition for four years so as to protect its "presently existing wilderness character and potential for [permanent] inclusion in the National Wilderness Preservation System."  Pub. L. No. 98-425; 98 Stat. 1619 (1984).  In its 1986 Land and Resource Management Plan for the Toiyabe National Forest, the FS recommended to Congress that the entire 47,000 acres in the West Hoover Addition be designated as a CDWA, and provided for its management under a "wilderness prescription."  (AR 1882, 1953.) This prescription prohibited snowmobile use.  (AR 1953.)  The FS issued supplemental Forest Orders in April 1986 and September 2004, reaffirming its ban on motorized vehicles in the West Hoover Addition.  (AR 33, 77-80.)

Due to the development of "faster and more powerful machines," trespass into the West Hoover Addition's and surrounding Wilderness' rugged terrain became easier as the land became "more readily accessible to snowmobiles."  (AR 1953.)  In 2004, to address the trespass, the FS initiated a public outreach effort to educate snowmobilers about the closure of the West Hoover Addition to snowmobile use.  (AR 3, 4, 20, 61-62, 2422.) This outreach included public meetings, letters, and news releases.  Id.  At that time, the FS began announcing it would re-evaluate the "issue of snowmobiling in the West Hoover [Addition] . . . over the next several years."  (AR 4.)  The FS

1  initiated consideration of this project to respond to the

2  trespass problem.  (AR 1953.)

3        B.   <u>Procedural History</u>

4             Scoping for this project began in late 2004.  On

5  November 30, 2004, the FS published a three-page scoping notice

6  proposing the development of the Travel Plan "to address agency

7  and public concerns with management of the area and adjacent

8  Emigrant and Yosemite Wilderness," including concerns that

9  "[o]ver-snow motorized intrusions within the [West Hoover

10  Addition] have become routine."  (AR 91-93.)  The FS received

11  approximately three thousand responses during the thirty-day

12  period for public comment on the scoping notice, despite the fact

13  that the FS declined to extend the comment period.  (AR 105-37,

14  138-65, 1722, 1876.)  In March 2005, the FS issued a Notice of

15  Proposed Action ("NOPA"), proposing that approximately 7,000

16  acres of the Proposed Wilderness be opened to seasonal snowmobile

17  use beginning with the 2005-2006 winter season.  (AR 1716-19.)

18  The FS again provided a thirty-day comment period, and received

19  thousands of responses.  (AR 1863 (estimating 11,500 comments

20  received).)

21             On July 18, 2005, the Bridgeport Ranger District of the

22  Humboldt-Toiyabe National Forest completed the Biological

23  Evaluation/Biological Assessment ("BE/BA") and Wildlife

24  Specialist Reports.  (AR 1687-1710, 1908-45.)  These documents

25  did not identify any major impacts from the proposed action, or

26  any potential for any species to be moved toward listing under

27  the Endangered Species Act ("ESA").

28             On July 19, 2005, the FS released an Environmental

1   Assessment ("EA") that analyzed the Travel Plan's effects on all
2   potentially affected resources such as recreation,
3   wilderness/roadless qualities, wildlife, special uses, watershed
4   condition, economics, air quality, and scenery.  (AR 1868-1907.)
5   Also on July 19, 2005, the FS issued a Decision Notice ("DN") and
6   a Finding of No Significant Impact ("FONSI"), formally amending
7   the Humboldt-Toiyabe Land and Resource Management Plan to open
8   approximately 7,000 acres of the West Hoover Addition to seasonal
9   snowmobile use.  (AR 1950-64.)  The DN/FONSI authorized the
10  seasonal snowmobile use, with a closure date of April 15 (subject
11  to the District Ranger's determination that an earlier or later
12  date was appropriate), and required the implementation of a
13  variety of resource protection measures.  (AR 1953-55.)  The FS
14  did not prepare an Environmental Impact Statement ("EIS"), as it
15  determined the opening would "not have a significant effect on
16  the quality of the human environment."  (AR 1961-62.)

17          Plaintiffs and others filed administrative appeals
18  regarding the decision to open the West Hoover Addition to
19  snowmobile use.  (AR 2024-2181.)  On October 21, 2005, the Appeal
20  Deciding Officer, Deputy Regional Forester Catherine L. Beaty,
21  affirmed the Forest Supervisor's decision to approve the plan.
22  (AR 2181-2204.)  On December 21, 2005, the FS issued a new Forest
23  Order declaring the 7,000 acres open for snowmobile use beginning
24  in the winter of 2005-2006.  (AR 2482.)

25          On December 21, 2005, plaintiffs filed the original
26  complaint in this case alleging causes of action under 1) the
27  National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et
28  seq.; 2) the Administrative Procedure Act ("APA"), 5 U.S.C. §§

1   701 et seq.; 3) the Wilderness Act of 1964, 16 U.S.C. §§ 1131 et

2   seq.; and 4) the National Trails Systems Act ("NTSA"), 16 U.S.C.

3   §§ 1241 et seq.  (Compl.)  Plaintiffs filed a First Amended

4   Complaint ("FAC") on March 10, 2006.  (FAC.)

5           On June 1, 2007, plaintiffs filed this motion for

6   summary judgment on their NEPA and APA claims.[2]  Plaintiffs seek

7   a declaration that the FS violated NEPA and the APA, and request

8   the court to vacate the July 2005 DN and associated December 2005

9   Forest Order.  Additionally, plaintiffs request that the court

10  order the FS to reinstate and strictly enforce the snowmobile

11  ban, while retaining jurisdiction to assure its compliance.  On

12  June 29, 2007, the Federal Defendants filed a cross-motion for

13  summary judgment and to strike portions of the Declaration of

14  Jeffrey Erodes.

15  II.  Discussion

16      A.  Standing

17          Defendants do not argue that plaintiffs lack standing.

18  In his declaration, Jeffrey Erodes states that he is an active

19  member of plaintiff NRDC and the Sierra Club, organizations

20  formed to protect environmentally-significant lands, and that he

21  regularly spends personal and professional time in the West

22  Hoover Addition.  John Buckley, in his declaration, states that

23  he is the Executive Director of plaintiff Central Sierra

24  Environmental Resource Council, an organization formed to protect

25  _____

26      [2]   Plaintiffs do not seek summary judgement on their
    claims under the Wilderness Act and NTSA.  On July 20, 2007,
    plaintiffs moved to voluntarily dismiss these claims, pursuant to
27  Federal Rule of Civil  Procedure 41(a)(2).  (Not. of Voluntary
    Dismissal (Docket No. 58).)  The court grants plaintiffs' motion.
28

1 and conserve public lands in the Sierra Nevada region, and that

2 he has visited and plans to return in the future to the West

3 Hoover Addition.  In her declaration, Heidi Hall, a member of the

4 Sierra Club and resident of Mono County, California, states that

5 she has skied in the West Hoover Addition and is personally

6 affected by FS's land management decisions.  Owen Malloy, a

7 member of the Sierra Club's Toyiabe Chapter, states in his

8 declaration that he engaged in a variety of non-motorized winter

9 activity in the project area.   These facts are sufficient to

10 confer standing on plaintiffs to bring this suit.  See Ocean

11 Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846,

12 859-862 (9th Cir. 2005) (discussing standing requirements in the

13 context of suit under NEPA); Pit River Tribe v. United States

14 Forest Serv., 469 F.3d 768, 779 (9th Cir. 2006) (same).

15          B.   Federal Defendants' Motion to Strike

16          The Federal Defendants move to strike extra-record

17 evidence proffered by plaintiffs, specifically paragraphs 6-36

18 and the exhibits attached to the declaration of Jeffrey Erdoes.[3]

19 In the Ninth Circuit, materials not present in the administrative

20 record may be considered by a court reviewing an agency decision

21 in four situations: (1) when they are "necessary to determine

22 whether the agency has considered all relevant factors and has

23 explained its decision," (2) "when the agency has relied on

24 documents not in the record," (3) "when supplementing the record

25 is necessary to explain technical terms or complex subject

26

27          [3]   Federal Defendants do not move strike the first five
   paragraphs of the Erdoes declaration.  (Defs.' Reply on Mot. to
28 Strike 2 n.1.)

1  matter," or (4) "when plaintiffs make a showing of agency bad

2  faith."  Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,

3  100 F.3d 1443, 1450 (9th Cir. 1996) (internal quotations

4  omitted).  Additionally, where specific facts must be presented

5  in the form of affidavits or other evidence to establish

6  standing, the court will take these facts to be true for the

7  purposes of a summary judgment motion.  See Lujan v. Defenders of

8  Wildlife, 504 U.S. 555, 561 (1992); see also Nw. Envt'l Def. Ctr.

9  v. Bonneville Power Admin., 117 F.3d 1520, 1528 (9th Cir. 1997)

10 ("Bonneville Power Admin.") (considering extra-record affidavits

11 for the purpose of determining whether the plaintiffs had

12 standing to sue).

13        Plaintiffs submitted the extra-record declaration of

14 Jeffrey Erodes in order to establish standing.  (Pls.' Opp'n to

15 Defs.' Mot. to Strike 1.)  To the extent that the Erodes

16 declaration and attached exhibits could be used in support of

17 other arguments, the court has not relied upon them, and

18 plaintiffs have indicated that they do not intend the

19 declarations be used for any other purpose than establishing

20 standing.  Bonneville Power Admin., 117 F.3d at 1528 (court may

21 properly consider extra-record evidence "not in order to

22 supplement the administrative record on the merits, but rather to

23 determine whether [plaintiffs] satisfy" standing requirements).

24 Therefore, the court declines to strike these declarations.

25        C.   Summary Judgment

26        Summary judgment is proper "if the pleadings,

27 depositions, answers to interrogatories, and admissions on file,

28 together with the affidavits, if any, show that there is no

8

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact, and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

### 1. Standard of Review

The court reviews plaintiffs' NEPA claims challenging the decision of the FS under the APA. Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005) (reviewing NEPA claims under APA); Ocean Advocates, 402 F.3d 846, 858 (9th Cir. 2005) (same). Under the APA, 5 U.S.C. § 706(2)(A), the reviewing court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." See Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1114 (9th Cir. 2000) (agency's decision to prepare and EA instead of an EIS reviewed under the arbitrary and capricious standard); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 376-77 (1989) (substantive NEPA decisions by an agency are reviewed under the arbitrary and capricious standard).

1    This is a "deferential standard . . . designed to
2    ensure that the agency considered all of the relevant factors and
3    that its decision contained no clear error of judgment." Pac.
4    Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries
5    Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations
6    omitted).  An agency action should only be overturned when the
7    agency "has relied on factors which Congress has not intended it
8    to consider, entirely failed to consider an important aspect of
9    the problem, offered an explanation for its decision that runs
10   counter to the evidence before the agency, or is so implausible
11   that it could not be ascribed to a difference in view or the
12   product of agency expertise." Id. (quoting Motor Vehicle Mfrs.
13   Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43
14   (1983)).  The court must ask whether the agency considered "the
15   relevant factors and articulated a rational connection between
16   the facts found and the choice made." Natural Res. Def. Council
17   v. U.S. Dep't of the Interior, 113 F.3d 1121, 1124 (9th Cir.
18   1997).

19       The court is not empowered to substitute its judgment
20   for that of the agency. Ariz. Cattle Growers' Ass'n v. U.S. Fish
21   & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001) (citing
22   Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,
23   416 (1971)).  Moreover, the court should review the agency's
24   actions based on the administrative record presented by the
25   agency. See Ctr. for Biological Diversity v. U.S. Fish &
26   Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006) ("When
27   reviewing an agency decision, the focal point for judicial review
28   should be the administrative record already in existence, not

some new record made initially in the reviewing court.")
(internal quotations and citations omitted).  Generally, there
are no genuine issues of material fact, and court does not "find"
underlying fact.  See, e.g., Nw. Motorcycle Ass'n v. United
States Dep's of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994);
Bank of Commerce of Laredo v. City Nat'l Bank of Laredo, 484 F.2d
284, 289 (5th Cir. 1973).  The court's role in such cases "is not
to resolve contested fact questions which may exist in the
underlying administrative record, but rather the court must
determine the legal question of whether the agency's action was
arbitrary and capricious."  Gilbert Equip. Co. v. Higgins, 709 F.
Supp. 1071, 1077 (S.D. Ala. 1989), aff'd, 894 F.2d 412 (11th Cir.
1990).

        "NEPA exists to ensure a process, not particular
substantive results."  Hells Canyon Alliance v. United States
Forest Serv., 227 F.3d 1170, 1177 (9th Cir. 2000).  Here, there
are three main issues under NEPA.  The first issue is whether the
FS was required to prepare an EIS rather than the abbreviated EA.
The second issue is whether the FS issued an inadequate EA and
FONSI.  The third issue is whether the FS violated NEPA by not
soliciting enough public comment on its NEPA documents.

                2.   Necessity of an EIS

        Plaintiffs challenge the failure of the FS to prepare
an EIS for this project.  The relevant provision of NEPA provides
that "all agencies of the Federal Government shall . . . include
in every recommendation or report on proposals for legislation
and other major Federal actions significantly affecting the
quality of the human environment, a detailed statement by the

                            11

responsible official on (i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). "Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS." Ocean Advocates, 402 F.3d at 864. If, after preparation of the EA, the agency decides not to prepare an EIS, it must put forth a "convincing statement of reasons [in the form of a FONSI] that explain why the project will impact the environment no more than insignificantly." Id. (citation omitted); see also 40 C.F.R. § 1508.13 (listing requirements for a FONSI).[4] The FONSI is crucial to a court's evaluation of whether the agency took the requisite "hard look" at the potential impact of a project. Ocean Advocates, 402 F.3d at 864.

"[A]n EIS must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (citation omitted) (emphasis in original) ("Idaho Sporting Cong. I"). To trigger the requirement for an EIS, "a plaintiff need not show that significant effects will in fact occur[;] raising substantial questions whether a project may have a significant effect is sufficient." Id. at 1150 (citation omitted) (emphasis in original).

40 C.F.R. § 1508.27 explains how an agency or court is

_____

[4]   Unless otherwise noted, all citations to the Code of Federal Regulations are to the 2005 version, the version in effect at the time of the FONSI.

to interpret "significantly" in 42 U.S.C. § 4332(2)(C).  The
regulation gives the term two components: context and intensity.
Context refers to the setting in which it takes place.  Intensity
means "the severity of the impact."  40 C.F.R. § 1508.27.

In considering the severity of a project's impact, a
reviewing agency should consider ten factors.[5]  "[O]ne of these

---

[5]     The following should be considered in evaluating
intensity:

(1)  Impacts that may be both beneficial and adverse.  A
significant effect may exist even if the Federal agency
believes that on balance the effect will be beneficial.

(2)  The degree to which the proposed action affects
public health or safety.

(3)  Unique characteristics of the geographic area such
as proximity to historic or cultural resources, park
lands, prime farmlands, wetlands, wild and scenic
rivers, or ecologically critical areas.

(4)  The degree to which the effects on the quality of
the human environment are likely to be highly
controversial.

(5)  The degree to which the possible effects on the
human environment are highly uncertain or involve
unique or unknown risks.

(6)  The degree to which the action may establish a
precedent for future actions with significant effects
or represents a decision in principle about a future
consideration.

(7)  Whether the action is related to other actions with
individually insignificant but cumulatively significant
impacts.  Significance exists if it is reasonable to
anticipate a cumulatively significant impact on the
environment.  Significance cannot be avoided by terming
an action temporary or breaking it down into small
component parts.

(8)  The degree to which the action may adversely affect
districts, sites, highways, structures, or object
listed in or eligible for listing in the National
Register of Historic Places or may cause loss or
destruction of significant scientific, cultural, or

13

1  factors may be sufficient to require preparation of an EIS in

2  appropriate circumstances."  Ocean Advocates, 402 F.3d at 865.

3  Factor (1) should be kept in mind by a reviewing court as it

4  considers the other factors.  "A significant effect may exist

5  even if the Federal agency believes that on balance the effect

6  will be beneficial."  40 C.F.R. § 1508.27(b)(1).

7          Plaintiffs argue that virtually all of the intensity

8  factors raise sufficient substantial questions regarding whether

9  the project may have a sufficiently significant effect to require

10 an EIS.  According to plaintiffs, the Travel Plan significantly

11 affects the environment for three principal reasons.  One, the

12 Travel Plan threatens wildlife and non-motorized recreational

13 users.  Two, the Travel Plan fosters violations of federal law

14 and sets a negative precedent for future management of the West

15 Hoover Addition as well as Congressionally designated wilderness

16 areas.  Three, the Travel Plan is highly controversial.

17          a.   Degree of Threat to Wilderness Qualities of

18                the Project Area

19          If an agency determines that the proposed action is not

20 likely to have a significant effect, the agency may issue a

21 FONSI.  Nw. Envtl. Defense Ctr. v. Wood, 947 F. Supp. 1371, 1382

22

23         historical resources.

24         (9) The degree to which the action may adversely affect
           an endangered or threatened species or its habitat that
25         has been determined to be critical under the Endangered
           Species Act of 1973.

26         (10) Whether the action threatens a violation of
           Federal, State, or local law or requirements imposed
27         for the protection of the environment.

28 40 C.F.R. § 1508.27.

14

(D. Or. 1996), aff'd, 97 F.3d 1460 (9th Cir. 1996) ("NEDC").  The
Administrative Record, specifically the EA, is replete with
analysis concerning the Travel Plan's effects on the wilderness
characteristics of natural integrity, apparent naturalness,
remoteness, solitude, primitive recreation, manageability of the
area, and affects on Critical Aquatic Refuges for the Yosemite
toad.  (AR 1885-87.)  The EA determined that snowmobile use would
have little effect on the project area's wilderness qualities
should the area later be designated as a CDWA.  (AR 1886.)  Nor
would the Travel Plan impact the FS's recommendation that the
project area should be a CDWA.  (AR 1886-87.)  Further, the FONSI
contains measures to protect the project area's wilderness
qualities, including education and adjustment of future
snowmobile use based on monitoring.  For all these reasons, the
FS's FONSI is not arbitrary and capricious.  See NEDC, 947 F.
Supp. at 1385 (upholding agency's FONSI as not arbitrary and
capricious so that an EIS was not required).

        Moreover, plaintiffs' argument that the Travel Plan's
effects are uncertain does not render the FONSI arbitrary and
capricious.  (Pls.' Mot. for Summ. J. 16-17.)  "NEPA regulations,
however, do not require a reviewing agency to eliminate all
uncertainty prior to issuing a FONSI."  Id. (citing Greenpeace
Action v. Franklin, 14 F.3d 1324, 1336 (9th Cir. 1992)).  The FS
explained that: "While uncertainty exists over the amount of
snowmobiling that could occur in the future, the effects of
snowmobiles on the environment are well known and are not
uncertain and do not involve unique or unknown risks."  (AR
1962.)  Further, the FS chose to address any uncertainty over the

1   amount of future snowmobiling through an adjustment in snowmobile

2   management based on monitoring the effects that snowmobiles may

3   have.  (Id.)   Therefore, the FONSI's minimal uncertainty does not

4   require the FS to have prepared an EIS.

5                    b.   Encouraging Subsequent Violations of Law

6              Plaintiffs argue that the FS was required to prepare an

7   EIS because the Travel Plan sets a negative precedent and

8   encourages violations of law by facilitating trespass into CDWAs.

9   (Pls.' Mot. for Summ. J. 17-19.)   However, the Travel Plan does

10  not authorize the use of snowmobiles in CDWAs or NSTs, like the

11  PCT.  (AR 1953, 1956.)   Because the West Hoover Addition's

12  closure to snowmobiles has not been stringently enforced, much of

13  the trespass occurred since users were unaware that the area was

14  closed.  (AR 82, 1880.)   The FS initiated education and

15  enforcement efforts to reduce trespass in 2004.  (AR 3-4, 20, 58-

16  68, 81-83, 2232-42, 2315-2420, 2422, 2523-26.)   Further, the

17  DN/FONSI and implementation strategy for the Travel Plan mandates

18  improved signage of boundaries of lands where snowmobiles are

19  permitted, enhancement of public education, continuation of FS

20  patrols, and implementation of additional enforcement efforts to

21  protect CDWAs, NSTs, and other areas closed to snowmobile use.

22  (AR 1954, 2510-14.)   Accordingly, plaintiffs' argument that an

23  EIS was required because the Travel Plan assures further

24  violations of law fails.

25                    c.   Degree of Controversy of Travel Plan

26             "A federal action is controversial if a substantial

27  dispute exists as to its size, nature or effect."   Wetlands

28  Action Network v. United States Army Corps of Eng'rs, 222 F.3d

16

1105, 1122 (9th Cir. 2000) (citation omitted).  "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions."  <u>Nat'l Parks & Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 736 (9th Cir. 2001) (citation omitted).  Once this evidence is presented to the agency, the agency has the burden of demonstrating why this evidence does not create a controversy.  <u>Id.</u>  "The existence of opposition to a use, however, does not render an action controversial."  <u>Wetlands Action Network</u>, 222 F.3d at 1122.

Plaintiffs argue that the Travel Plan is controversial because the FS received an extremely high number of comments that also raised substantial questions about the serious ecological, aesthetic, recreational, legal, and policy ramifications of opening the project area to snowmobiles.  (Pls.' Mot. for Summ. J. 19-21.)  However, the receipt of comments in opposition to a proposal does not render that proposal controversial under NEPA.  <u>Bonneville Power Admin.</u>, 117 F.3d at 1536 ("Controversy does not refer to the existence of opposition to a use.") (further citations omitted).  The comments cited by plaintiffs do not rise to the level of a substantial dispute.  (AR 1961-62, 2184-85.)  Instead, most of the comments cited by plaintiffs dealt with the opposition to the Travel Plan itself, not with the project's effects.  Those comments addressing the project's effects do not rise to the level of a substantial dispute because given the extensive scientific analysis conducted by the National Park Service at Yellowstone National Park, snowmobiles' effects on the environment are not highly controversial.  NEPA only requires a

"'reasonably thorough' discussion of the environmental consequences in question, not unanimity of opinion, expert or otherwise." <u>City of Carmel-by-the-Sea v. United States Dep't of Transp.</u>, 123 F.3d 1142, 1150-51 (9th Cir. 1997).  Moreover, "when faced with conflicting evidence, an agency may rely on its own evidence." <u>Id.</u> at 1151.

Additionally, the FS acknowledged the concerns raised by the comments and addressed them in its EA.  (AR 1876-78, 1879-1903.)  The EA specifically addressed these concerns by suggesting enhancement of enforcement efforts as well as improving education, enlisting volunteers, providing more information, and adjusting snowmobile use.  (AR 1872-73, 1877-78, 1954-55.)  Therefore, the Travel Plan does not create a "substantial dispute" so that it was not "controversial." Consequentially, the FS was not required to prepare an EIS as a matter of law.  Accordingly, the court will deny plaintiffs' motion and grant defendants' on plaintiffs' NEPA claim that an EIS was required.

### 3.   Adequacy of the FS's EA and DN/FONSI

As discussed above, when an EIS is not categorically required, the agency must prepare an EA to ascertain whether an EIS is necessary.  <u>Ocean Advocates</u>, 402 F.3d at 864.  If the agency decides not to prepare an EIS, it must put forth a "convincing statement of reasons [in the form of a FONSI] that explain why the project will impact the environment no more than insignificantly." <u>Id.</u> (citation omitted); <u>see also</u> 40 C.F.R. § 1508.13 (listing requirements for a FONSI).  Plaintiffs argue that the EA/FONSI was inadequate because it 1) relied on an

18

unlawfully narrowed project scope and overlooked reasonable
alternatives and 2) did not adequately consider direct, indirect,
and cumulative impacts of snowmobiles in the following respects:
a) sensitive wildlife and habitat, b) water and air quality, c)
safety of non-motorized users, d) CDWAs and NSTs beyond the
project area, and e) relied on unproven or failed mitigation
measures to achieve its FONSI.

          a.    <u>Evaluation of the Travel Plan's Purpose and
Need and Analyzed Range of Alternatives</u>

               i.    <u>Travel Plan's Statement of Purpose and
Need</u>

The regulations implementing NEPA explain that an EIS
"shall briefly specify the underlying purpose and need to which
the agency is responding in proposing the alternatives including
the proposed action." 40 C.F.R. § 1502.13. The FS's definition
of a project's purpose and need is to be given considerable
deference and evaluated under a standard of reasonableness.
<u>Friends of Southeast's Future v. Morrison</u>, 153 F.3d 1059, 1066-67
(9th Cir. 1998) (further citations omitted).

The Travel Plan's purpose and need was to address
changing patterns of winter reaction in the West Hoover Addition.
(AR 1871.) Due to population increases in California and Nevada
and improvements in snowmobile technology, the demand for
snowmobiling in the area has increased. (<u>Id.</u>) The area around
the Leavitt Lake Road corridor is high in elevation so that it
provides more consistent snowmobiling opportunities than lower
elevations. (<u>Id.</u>) Further, the project area provides open bowls
and more difficult terrain that allow snowmobilers to take

advantage of the newer snowmobiles' capabilities.  (Id.)  Terrain
that has sufficient altitude to provide such consistent snow can
only be found in limited places.  (Id.)  The recent closures of
other areas formerly available to snowmobiling, such as parts of
the Carson Ranger District and the Inyo National Forest, has
caused increased demand for snowmobiling around the project area.
(AR 1871, 1880.)

        The Ninth Circuit upheld agency statements of purpose
and need that were comparably narrow to the FS's here.  See City
of Carmel-by-the-Sea, 123 F.3d at 1155-57; Friends of Southeast's
Future, 153 F.3d at 1067.  In City of Carmel-by-the Sea, the
United States Department of Transportation's stated project
purpose was to achieve a particular traffic flow on a stretch of
highway.  In Friends of Southeast's Future, the FS's purpose was
to meet the market demand for timber in southeast Alaska.  The
Travel Plan's purpose and need is comparable in narrowness of
scope to these other projects.

        Plaintiffs further argue that the FS cannot rely on
closures to snowmobiles of other federal lands to find that
demand for snowmobiling in the West Hoover Addition has
increased.  (Pl.'s Mot. for Summ. J. 37.)  Plaintiffs further
argue that defendants failed to consider demand for non-motorized
sports, which plaintiffs contend are growing in popularity.
(Id.)  The FS found that non-motorized use represents only a
small portion of overall use of the project area during winter.
(AR 1875.)  Additionally, in the Multiple-Use Sustained-Yield Act
("MUSYA"), Congress gave the FS discretion to manage national
forests for multiple uses and adjust to meet changing needs and

1   conditions.  16 U.S.C. §§ 528 et seq.  MUSYA "breathe[s]

2   discretion at every pore."  Perkins v. Bergland, 608 F.2d 803,

3   806-07.  Moreover, the FS's determination is not arbitrary and

4   capricious.  (See AR 1880 (The EA discussed non-motorized use

5   qualitatively by stating that FS "personnel have noted only a few

6   skiers or snowshoers.  Most skiing use was noted in the Pickel

7   Meadows area that is more easily accessible than the project

8   area.  Some skiing use was noted in the spring, when access on

9   the Sonora Pass Highway is opened to highway traffic.").)

10  Accordingly, the court does not find the Travel Plan's purpose

11  and need statement problematic.

12                    ii.  Considered Range of Alternatives

13              Under NEPA, an agency must examine alternatives to the

14  proposed action.  See 42 U.S.C. § 4332(2)(E); 40 C.F.R. §

15  1508.9(b).  The purpose and need of a project determines the

16  range of alternatives that an agency must consider.  Vt. Yankee

17  Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S.

18  519, 551 (1978); Bonneville Power Admin., 117 F.3d at 1538.

19  Aside from a no-action alternative, an alternative is

20  "reasonable" if it meets the purpose and need for the proposed

21  action.  See Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d

22  1174, 1181 (9th Cir. 1990).  However, agencies do not have to

23  discuss alternatives that would not satisfy a proposed project's

24  purpose and need.  Id.; 40 C.F.R. § 1502.14(a); Vt. Yankee, 435

25  U.S. at 551.  "Common sense also teaches us that the 'detailed

26  statement of alternatives' cannot be found wanting simply because

27  the agency failed to include every alternative device and thought

28  conceivable by the mind of man."  Vt. Yankee, 435 U.S. at 551.

The Ninth Circuit counsels that "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." Headwaters, 914 F.2d at 1181 (citing N. Plains Res. Council v. Lujan, 874 F.2d 661, 666 (9th Cir. 1989); see also Idaho Conservation League v. Mumma, 956 F.2d 1508, 1522 (9th Cir. 1992) (noting that an agency is not required to consider "alternatives known to be unacceptable at the outset."). Nor does NEPA require an agency to discuss a minimum number of alternatives. See Native Ecosystems Council v. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005); Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994).

Where the expected impacts of a project are narrower, such that an EIS is not required, the agency may consider a smaller number of alternatives. Native Ecosystems, 428 F.3d at 1246. In Native Ecosystems, the Ninth Circuit found that an EA, which only considered in detail two alternatives--a "no-action" alternative and the "preferred alternative"--fully satisfied NEPA. Id. at 1245. In West Land Exchange v. Dombreck, 47 F. Supp. 2d 1196 (D. Or. 1999), the United States District Court for the District of Oregon upheld an EIS that discussed in detail only a single action alternative. Id. at 1211-12.

Here, the EA considered in detail the no-action alternative and the proposed action. This comports with the NEPA processes in Native Ecosystems and West Land Exchange. Additionally, the FS considered seven other alternatives in its EA, but did not discuss them in detail for various reasons. (AR

22

1   1875-76.)   The FS considered opening the entire West Hoover

2   Addition to snowmobiles, rather than just 7,000 acres, but did

3   not consider this proposal in detail because of the potential to

4   generate trespass into closed areas and the difficulty of

5   enforcing these expanded boundaries.  (AR 1875.)  The FS also

6   considered designating specific snowmobile trails in the project

7   area, but declined to consider this proposal in detail because it

8   would not meet the project's stated purpose and need of providing

9   open bowl snowmobiling opportunities.  (AR 1876.)  Additionally,

10  a proposal to provide for snowmobile use in other areas of

11  northern Mono County in lieu of opening the project area would

12  not meet the project's purpose and need of providing an area of

13  sufficient elevation with consistent snowfall.  (AR 1875.)

14  Moreover, all other FS managed lands in northern Mono County are

15  open to snowmobiles, except the CDWAs and the West Hoover

16  Addition, and these opened areas are not of sufficient elevation.

17  (Id.)  Lastly, the FS considered a proposal to open part of the

18  7,000 acre project area--open only the Leavitt Creek drainage and

19  keep the McKay Creek drainage closed.  (Id.)  However, this

20  proposal would not meet the project's purpose and need because it

21  would exclude nearly half of the project area from snowmobile

22  use, including some of the best snowmobile terrain.  (Id.)

23  Moreover, the opening of only the Leavitt Creak drainage area

24  would result in boundary enforcement problems.  (Id.)  The FS

25  considered the accepted proposal and no-action alternatives in

26  detail as well as several other alternatives.  Consequentially,

27  the FS complied with the NEPA requirement of adequately analyzing

28  a reasonable range of alternatives in accordance with the

23

1 project's statement of purpose and need.

2                    b.    <u>FS's Consideration of Direct, Indirect, and</u>

3                        <u>Cumulative Impacts of the Travel Plan</u>

4         The CEQ regulations provide that an agency must

5 consider "connected actions" and "cumulative actions" within a

6 single EA. <u>Wetlands Action Network</u>, 222 F.3d at 1118 (citing 40

7 C.F.R. § 1508.25).  A connected or cumulative action must be

8 considered together to prevent an agency from dividing a project

9 into multiple actions, each of which individually has an

10 insignificant environmental impact, but which collectively have a

11 substantial impact. <u>Id.</u>  Actions are connected if they

12 "[a]utomatically trigger other actions which may require

13 environmental impact statements[,] . . . [c]annot or will not

14 proceed unless other actions are taken previously or

15 simultaneously [, or] . . . [a]re interdependent parts of a

16 larger action and depend on the larger action for their

17 justification." 40 C.F.R. § 1508.25(a).  Cumulative actions are

18 those "which when viewed with other proposed actions have

19 cumulatively significant impacts."  40 C.F.R. § 1508.25(a)(2).  A

20 cumulative impact is "the impact on the environment which results

21 from the incremental impact of the action when added to other

22 past, present, and reasonably foreseeable future actions . . . .

23 Cumulative impacts can result from individually minor but

24 collectively significant actions taking place over a period of

25 time." 40 C.F.R. § 1508.7.

26                        i.    <u>Consideration of Sensitive Wildlife and</u>

27                        <u>Habitat</u>

28         The CEQ regulations mandate that an agency evaluate

"[t]he degree to which the action may adversely affect an endangered or threatened species" when determining whether an action will significantly affect the environment.  40 C.F.R §
1508.27(b)(9).  Plaintiffs argue that the FS did not adequately consider snowmobiles' impact on sensitive wildlife and habitat.
(Pls.' Mot. for Summ. J. 24-27.)

The FS considered the potential effects on wildlife and habitat before authorizing the Travel Plan.  The EA discussed that the Travel Plan could potentially increase noise disturbance and human presence during winter months that could increase stress on wildlife.  (AR 1888, 1891.)  The effects could lead to wildlife dispersal and avoidance of the project area.  (AR 1888.)
However, the Travel Plan proposes an April 15 closure date for snowmobile use in order to limit potential effects on wildlife in the spring, when more wildlife species would be coming to or present in the project area.

The EA also disclosed the potential effects of the Travel Plan for each wildlife species found in the project area during winter.  (AR 1888.)  The FS also considered FS sensitive species and species listed under the ESA in the BE/BA as well as a Wildlife Specialist Report ("WSR").  The EA discussed the direct, indirect, and cumulative effects that snowmobiles would have on Yosemite toads and potential habitat for mountain yellow-legged frogs due to snowmobile exhaust pollutants accumulating in the snow.  (AR 1891.)  As noted in the EA, other cumulative sources of pollutants in the project area would come from United States Marine Corps ("USMC") vehicle use as well as summertime vehicle use around Leavitt Lake.  (AR 1891-92.)  The EA and BE/BA

25

1  analyzed the effects of exhaust pollutants from those sources and

2  found that no adverse effects to Yosemite toad are expected to

3  occur from driving over any sort of toad vegetative habitat.  (AR

4  1891-92, 1932-33.)   The April 15 proposed closure date means that

5  snowmobiles would not be driving over exposed soil or fully

6  exposed Yosemite toad vegetative habitat, and Leavitt, Latopie,

7  and Koenig Lakes should still be covered by ice.  (Id.)   The

8  toads are expected to hibernate until after April 15 so that no

9  adverse impacts to Yosemite toads are expected to occur during

10 the species' spring breeding season.  (AR 1891, 1932-33.)

11 Further, the Travel Plan requires monitoring of toad populations

12 within the project area be taken into consideration for periodic

13 adjustments to snowmobile use.  (AR 1892, 1932-33, 1954-55.)

14      Moreover, the EA, BE/BA, and WSR analyzed the Travel

15 Plan's effects on birds and their habitat.  (AR 1690, 1692-97,

16 1700-06, 1917-23, 1892-93.)   The EA and BE/BA concluded that

17 there would be no impacts to northern goshawks partly since there

18 have been no recorded sightings of northern goshawk within the

19 project area.  (AR 1893, 1913, 1918.)   There has not been a

20 sighting of a great gray owl in the project area since 1960.  (AR

21 1892, 1912, 1921-22.)   Although the Travel Plan and noise would

22 make the area less attractive to great gray owls, the April 15

23 closure date and authority to periodically adjust snowmobile use

24 would minimize any possible impacts.  (AR 1892, 1958.)

25      The FS also throughly considered the Travel Plan's

26 effects on mammals.  (AR 1707-07, 1893, 1923-26.)   Due to snow

27 compaction and carbon dioxide accumulation, the EA concluded that

28 the Travel Plan could affect subnivean mammal habitat.  (AR

26

1893.)  However, these effects were not significant because of
the dispersed nature of snowmobiling.  (<u>Id.</u>)  Moreover, the EA
found that the mule deer, which is not an ESA or FS sensitive
species, are not present in the project area during the winter.
(<u>Id.</u>)  The BE/BA found that wolverines were not found in the
project area during surveys and are unlikely to use the project
area during the winter months due to USMC training.  (AR 1937.)
The EA found that the Travel Plan would increase disturbance of
pine marten habitat, but the effects would be minor and not limit
marten from occupying the area.  (AR 1893, 1912.)

        Plaintiffs disagree with the FS's conclusions and argue
that the FS did not properly address scientific studies.  (Pls.'
Mot. for Summ. J. 25-26.)  However, "[w]hen specialists express
conflicting views, an agency must have discretion to rely on the
reasonable opinions of its own qualified experts even if, as an
original matter, a court might find contrary views more
persuasive.  <u>Marsh</u>, 490 U.S. at 378.  "Because analysis of the
relevant documents 'requires a high level of technical
expertise,' we must defer to 'the informed discretion of the
responsible federal agencies.'"  <u>Id.</u> at 377 (citing <u>Kleppe v.
Sierra Club</u>, 427 U.S. 390, 412 (1976); <u>Baltimore Gas & Electric
Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 103 (1983)).
The Ninth Circuit counsels deference "to agency expertise on
questions of methodology unless the agency has completely failed
to address some factor, consideration of which was essential to a
truly informed decision . . . ."  <u>Bear Lake Watch, Inc. v. FERC</u>,
324 F.3d 1071, 1077 (9th Cir. 2003) (citing <u>Inland Empire Pub.
Lands Council v. Schultz</u>, 992 F.2d 977, 981 (9th Cir. 1993)

27

(further citations omitted)).

Though plaintiffs' belief that their scientific conclusions are correct is sincerely held, the court must defer to the FS's scientific conclusions, where as here, there is not a complete failure to address an important factor.  Accordingly, the FS adequately considered the direct, indirect, and cumulative effects on sensitive wildlife and habitat.

ii.  <u>Consideration of Water and Air Quality</u>

Plaintiffs argue that the FS failed to adequately analyze the project's effects on water and air quality.  (Pls.' Mot. for Summ. J. 27-29.)  The FS used studies from Yellowstone National Park, which looked at the impacts to air and water quality of a much greater quantity of snowmobile use.  The Yellowstone study found those effects to be negligible, despite the much greater levels of use than are at issue in this case.  The FS also used available snowmobile use data to conclude that levels and concentrations of snowmobile use would likely remain low under the Travel Plan.  Additionally, the Travel Plan provides for monitoring of effects, and adjustment of the levels of snowmobile use if those effects are greater than expected.

The FS analyzed the effects that snowmobiles could have on snowpack chemistry due to the fact that snowmobiles discharge fuel, lubricants, and exhaust into the snowpack, which may transport these pollutants to surface water as the snowpack melts.  (AR 1899.)  The FS determined that these effects would not be significant because of the dispersed nature of snowmobiling relative to quantity of snowmobiles, as the Yellowstone study so indicated, and that mitigation measures

28

1  would minimize effects.  (AR 1900.)  The project level of
2  snowmobile use in the project area is only about 20 snowmobiles
3  on weekdays, and 100 on weekend days.  (AR 1880.)  In the
4  Yellowstone study, where snowmobile usage topped 1,000 per day,
5  concentrations of snowmobile pollutants were found to diminish
6  rapidly with distance from roadways and designated trails.  (AR
7  1449-72, 1900, 1907, 2191-92.)  At distances as little as 50
8  meters from concentrated snowmobile use on designated trails,
9  contamination was undetectable and well below levels likely to
10 threaten human or ecosystem health.  (AR 1469-70.)  Moreover the
11 Yellowstone study's conclusion on snowpack chemistry is
12 consistent with specific studies of water quality in the West
13 Hoover Addition.  A 2005 sample collection indicated some
14 chemicals of the sort emitted by snowmobiles in snowpack;
15 however, these areas are where use is currently allowed and would
16 continue regardless of whether the Travel Plan remained in
17 effect.  (AR 1899.)

18        The EA also discussed the effects that snowmobiles can
19 have on sediment loading in surface waters.  (AR 1899).
20 Sedimentation occurs when snowpack melts and snowmobiles disturb
21 soil.  (Id.)  The main sources of sediment in the project area
22 are from existing natural sources and roads.  (AR 1899.)
23 However, the FS found that the additional contribution of
24 sediment from snowmobiling is not significant.  (AR 1961.)  The
25 closure to snowmobiles around April 15 is before the snowpack
26 melts, and the FS can make seasonal adjustments to account for
27 changes in snowpack conditions.  (AR 1871, 1955, 2791-92.)

28        The FS considered the Travel Plan's effects on air

quality.  (AR 1902-03.)  The EA relied on the Yellowstone snowmobile study to conclude that the effects on air quality in the project area would be minimal.  (AR 1902-03, 1906-07.)  The Yellowstone study found that the concentrated amounts of exhaust at the entrance stations, where snowmobiles idle, complied with National Ambient Air Quality Standards.  (AR 311-12, 1902.) Further, despite the much higher use and concentration of snowmobiles in Yellowstone, the Yellowstone EIS found that Yellowstone would meet applicable air quality standards, even along travel corridors where highly concentrated snowmobile use occurs.  (AR 507, 639-40, 1902.)  The EA mentions the potential for, but does not rely on, future conversion to 4-stroke engines from the 2-stroke engines that are currently prevalent in snowmobiles.  (AR 1901.)  Four-stroke engines produce fewer emissions.  (Id.)  Instead, the FS relied on the Yellowstone studies, which had substantially greater snowmobile use and higher concentrations of use on groomed trials, to conclude that there would not be potential for significant environmental effects to air quality in the project area because there will be many fewer machines and use will be more dispersed compared to Yellowstone.  (AR 1898-1903.)  Finally, in accordance with the Appeal Deciding Officer's decision, the FS obtained the written concurrence from the Great Basin Unified Air Quality Control District that the Travel Plan would not result in emission of criteria pollutants for which the project area is designated in nonattainment.  (AR 2181-82, 2209.)  Consequentially, the FS adequately addressed air and water quality.

1        iii.  <u>Consideration of the Safety of Non-</u>

2              <u>Motorized Users</u>

3        Plaintiffs also argue that the FS did not adequately

4  consider the Travel Plan's effects on public safety. (Pls.' Mot.

5  for Summ. J. 29-30.)  NEPA's reference to the "human environment"

6  means the "physical environment--the world around us, so to

7  speak." <u>Metro. Edison Co. v. People Against Nuclear Energy</u>, 460

8  U.S. 766, 772 (1983).  On the other hand, "a <u>risk</u> of an accident

9  is not an effect on the physical environment.  A risk is, by

10 definition, unrealized in the physical world." <u>Id.</u> at 775

11 (emphasis in original).  The Ninth Circuit, adopting the district

12 court's reasoning, counsels that "NEPA does not require that an

13 agency take into account every conceivable impact of its actions,

14 including impacts on citizens' subjective experiences." <u>Bicycle</u>

15 <u>Trails Council of Marin v. Babbitt</u>, 82 F.3d 1445, 1466 (9th Cir.

16 1996).  In <u>Bicycle Trail Council</u>, the Ninth Circuit found that

17 the increased risk of accidents to bicyclists due to trail

18 changes did not need to be addressed in the NEPA process. <u>Id.</u> at

19 1466-67.

20       Even so, the EA did adequately consider the issue of

21 impacts to safety of non-motorized users.  The EA discussed that

22 although there have been reports of illegal snowmobile use in the

23 past, there have been few non-motorized recreationists in the

24 area and few reports of user conflicts. (AR 1875, 1880.)  The FS

25 noted that non-motorized users expressed fear and discomfort

26 about snowmobile use. (AR 1880.)  However, there were no direct

27 facts in the record indicating a particularized, heightened

28 safety concern resulting from the potential for collision between

31

snowmobilers and non-motorized users.  (Id.)  Moreover, the
Travel Plan's April 15 closure adequately addresses safety
conflicts since the period after April 15 is the prime season for
non-motorized recreational users.  (AR 1881.)  Lastly,
plaintiffs' argument that the Travel Plan increases avalanche
danger is overstated.  The EA does suggest that there will be an
increased potential for avalanches due to increased snowmobile
activity.  (AR 1901.)  However, the FS concluded that the
increase in avalanche hazard would be offset by user education
and posted warnings.  (AR 1901, 1961.)  Accordingly, plaintiffs'
argument that the FS did not adequately account for the safety of
non-motorized users fails.

iv.  Consideration of Impacts on CDWAs and

NSTs

NEPA "requires that an environmental analysis for a
single project consider the cumulative impacts of that project
together with 'past, present and reasonably foreseeable future
actions.'"  Native Ecosystems 304 F.3d at 894 (quoting 40 C.F.R.
§ 1508.7); Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d
957, 973 (9th Cir. 2002).  Because there are "'so many more EAs
prepared than EISs, adequate consideration of cumulative effects
requires that EAs address them fully.'"  Native Ecosystems, 304
F.3d at 896 (quoting Kern v. United States Bureau of Land Mgmt.,
284 F.3d 1062, 1076 (9th Cir. 2002)) (emphasis in original).

As discussed above, the EA fully addressed the indirect
and cumulative effects on wildlife, and air and water quality.
Moreover, the EA discussed the effects that the Travel Plan would
have in conjunction with USMC activity in the area.  The FS

1 | stated the potential effects on the Yosemite toad that could

2 | occur with snowmobile use given the USMC vehicle use in the area.

3 | (AR 1891-92.)  The EA also disclosed that the Travel Plan

4 | combined with USMC activity could make the area less desirable

5 | for great gray owls and the additional trampling and noise

6 | disturbance could displace pine marten.  (AR 1892-93.)  The EA

7 | also examined USMC vehicle emissions in evaluating the effect of

8 | snowmobile emissions.  (AR 1899-1902.)  Additionally, the EA

9 | analyzed the cumulative effects of the Travel Plan, USMC

10 | activity, and other recreationists to evaluate the effects on the

11 | general area's roadless characteristics.  (AR 1885-87.)  In

12 | assessing the cumulative effects on all potentially affected

13 | resources, the FS concluded that the cumulative effects on the

14 | area's wilderness characteristics would not be significant.  (AR

15 | 1961-63.)  The court finds that the FS's determination was not

16 | arbitrary and capricious.  Accordingly, the court will grant

17 | defendants' motion and deny plaintiffs' on this issue.

18 | v.   Consideration of Mitigation Measures

19 | The EA must include a "reasonably complete discussion

20 | of possible mitigation measures."  Wilderness Soc'y v. Bosworth,

21 | 118 F. Supp. 2d 1082, 1106 (D. Mont. 2000) (quoting Robertson v.

22 | Methow Valley Citizens Council, 490 U.S. 332, 351 (1989)).

23 | "Mitigation must 'be discussed in sufficient detail to ensure

24 | that environmental consequences have been fairly evaluated.'"

25 | Neighbors of Cuddy Mt. v. United States Forest Serv., 137 F.3d

26 | 1372, 1380 (9th Cir. 1998) (quoting Carmel-By-the-Sea, 123 F.3d

27 | at 1154) (further quotations omitted).  However, "[a] mere

28 | listing of mitigation measures is insufficient to qualify as the

33

1  reasoned discussion required by NEPA." Id. (citing Nw. Indian

2  Cemetery Protective Ass'n. v. Peterson, 795 F.2d 688, 697 (9th

3  Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988)).

4          The EA noted that the Travel Plan involves a number of

5  mitigation measures that would protect nearby CDWAs and NSTs as

6  well as non-motorized users by: (1) enlisting volunteers from

7  both motorized and non-motorized recreation communities to help

8  with monitoring, enforcement, and public education efforts; (2)

9  cooperating with the Inyo and Stanislaus National Forests,

10 Yosemite National Park, and Mono County to monitor snowmobile use

11 and protect closed areas; (3) enhancing FS public education

12 efforts through personal contacts, patrols, web site information,

13 and press releases; (4) enhancing signage of boundaries and

14 entrance points; (5) continuing FS patrols of the area, including

15 issuance of citations for those who violate boundaries; (6)

16 requesting that the State of California require more visible

17 snowmobile identification tags; (7) conducting a field review to

18 determine final placement of boundaries below the PCT, with the

19 participation of the PCT Association and the public; and (8)

20 using enforcement-related monitoring to determine incursions into

21 closed area and adjusting snowmobile use to address incursions.

22 (AR 1872, 1954.)  Further, the Travel Plan would implement

23 several resource protection measures to protect ecosystem

24 integrity, including: (1) using monitoring data for Yosemite toad

25 populations, other resource information from the California

26 Department of Fish and Game, and other Sierra Nevada Forest Plan

27 monitoring efforts to adjust snowmobile use as needed; (2) using

28 water quality data collected by the Lahontan Water Quality

34

Control Board to determine water quality impacts; (3) collecting and analyzing snow samples in 2005 and 2006 in cooperation with the Desert Research Institute to determine contaminant levels in the area; and (4) adjusting snowmobile use if the Great Basin Unified Air Quality Control District determines there are unacceptable levels of pollutants in the air.  (AR 1872-73, 1954-55.)  Moreover, the FS's discretion to adjust the April 15 snowmobile closure date allows it to modify its management plan should unanticipated issues arise and to mitigate any potential impacts.

Although the FS may not merely list the mitigation measures, the FS is not required to discuss how the FS would fund its resource protection measures as plaintiffs suggest.  "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926); see also Volpe, 401 U.S. at 415 (presumption of agency regularity and compliance applies to an agency's decision).  The FS has already carried out a number of mitigation measures connected with the Travel Plan.  The FS worked with the PCT Association to determine final boundary placement.  (AR 2212, 2508, 2510.)  The FS also worked with Mono County Sheriff's Department to form a snowmobile task force to institute a "Zero Tolereance" policy to help prevent snowmobile trespass.  (AR 82, 2188.)  Additionally, the FS has consulted with and obtained written concurrence from the Great Basin Unified Air Pollution Control District regarding air quality.  (AR 2210-11.)  Finally,

1  the FS has begun its public education and outreach measures.  (AR

2  2510-14.)

3          Although the "line between a [NEPA document] that

4  contains an adequate discussion of mitigation measures and one

5  that contains a 'mere listing' is not well-defined," Okanogan

6  Highlands Alliance v. Williams, 236 F.3d 468 (9th Cir. 2000), the

7  court finds the FS's discussion adequate.  Id. at 476.  The

8  Supreme Court reversed the Ninth Circuit in Methow Valley, 490

9  U.S. at 352 (1989), where the Ninth Circuit had found a NEPA

10  violation because "the effectiveness of the mitigation measures

11  had not been assessed, and the measures themselves had yet to be

12  developed."  Okanogan, 236 F.3d at 476.  Here, the FS committed

13  to applying several mitigation measures when implementing the

14  Travel Plan.  (AR 1954-55.)  Unlike Cuddy Mountain, and similar

15  to Methow Valley, the FS developed mitigation measures based on

16  its expertise in dealing with management issues in the project

17  area.  Accordingly, the FS's consideration of mitigation measures

18  was adequate.

19          The reviewing court's task "is to determine whether or

20  not as a matter of law the evidence in the administrative record

21  permitted the agency to make the decision it did."  Occidental

22  Eng'g Co. v Immigration and Naturalization Serv., 753 F.2d 766,

23  769 (9th Cir. 1985).  The FS's EA adequately discussed the

24  impacts that the Travel Plan would have in the project area.

25  Consequentially, the EA supports the FS's decision, and the court

26  will deny plaintiffs' motion and grant defendants' on plaintiffs'

27  NEPA claim that the EA was inadequate.

28

### 4.   Adequacy of Public Comment

The parties disagree as to whether or not public comment is required on a draft Environmental Assessment ("EA") before the FS makes a final decision.  Plaintiffs argue that a controlling Ninth Circuit case, <u>Citizens for Better Forestry v. United States Department of Agriculture</u>, 341 F.3d 961 (9th Cir. 2003) ("<u>CBF</u>"), mandates that, "the public must be given an opportunity to comment on draft EAs and EISs."  <u>Id.</u> at 971; <u>see also</u> <u>Anderson v. Evans</u>, 314 F.3d 1006, 1016 (9th Cir. 2002), <u>amended</u> <u>by</u> 371 F.3d 475 (9th Cir. 2004) (same).  Defendants argue that the statement in <u>CBF</u> is merely dicta and cite other circuits that expressly hold that the CEQ regulations do not require circulation of a draft EA.

The NEPA regulations at issue provide: "[T]he agency shall involve the public, to the extent practicable, in preparing [EAs]. . . ."  40 C.F.R. § 1501.4(b).  Further "[a]gencies shall . . . make diligent efforts to involve the public in preparing and implementing their NEPA procedures[,] . . . provide public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected[,] [and] . . . solicit appropriate information from the public."  40 C.F.R. § 1506.6.

Statements made by a court, not necessary to the decision, constitute "dictum" and have no binding effect in subsequent cases or on other courts.  <u>Export Group v. Reef Indus., Inc</u>., 54 F.3d 1466, 1472 (9th Cir. 1995).  The Supreme Court stated:

37

1
2
3
4

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgement in a subsequent suit, when the very point is presented for decision.

5  Humphrey's Ex'r v. United States, 295 U.S. 602, 627 (1935)

6  (citing Cohens v. Virginia, 19 U.S. 264, 399 (1821) (Marshall,

7  C.J.)).  Because the statement that "[t]he public must be given

8  an opportunity to comment on draft EAs and EISs" is not essential

9  to the holdings CBF and Anderson, it is dicta.  The CBF court

10  found that a failure to adequately inform the public of

11  environmental information, thus precluding them from submitting

12  informed comments prior to the finalization of a project plan,

13  violated NEPA regulations.  CBF, 347 F.3d at 970.  However, the

14  CBF court did not suggest that an agency is always required to

15  circulate a draft EA for public comment.  The CBF court did "not

16  establish[] a minimum level of public comment and participation

17  required by the regulations governing the EA and FONSI process

18  . . . [yet acknowledged] that the regulations at issue must mean

19  something."  Id.

20      Other district courts have held that the language

21  requiring circulation of draft EAs was dicta and that circulation

22  of draft EA is not required.  Sierra Nevada Forest Protection

23  Campaign v. Weingardt, 376 F. Supp. 2d 984 (E.D. Cal. 2005); Save

24  Our Sonoran, Inc. v. Flowers, Case No. 02-0761, 2006 WL 1160191,

25  at *14 (D. Ariz. May 2, 2006).  Several Courts of Appeal have

26  held that circulation of a draft EA is not necessary under the

27  NEPA regulations.  See Greater Yellowstone Coal v. Flowers, 359

28  F.3d 1257, 1279 (10th Cir. 2004) (not making available the EA and

other project documents before a decision was not found to be
arbitrary); Pogliani v. U.S. Army Corps of Eng'rs, 306 F.3d 1235,
1238-39 (2d Cir. 2002) (plaintiffs were unlikely to succeed on
their claim that defendant "erred by failing to release its draft
EA and FONSI for public comment prior to their issuance");
Alliance to Protect Nantucket Sound v. United States Dep't of
Army, 398 F.3d 105, 115 (1st Cir. 2005) ("there is no legal
requirement that an environmental assessment be circulated
publicly and, in fact, they rarely are"); Fund for Animals, Inc.
v. Rice, 85 F.3d 535, 549 (11th Cir. 1996) (there is no statutory
requirement that an agency provide opportunity for public comment
of any particular kind, and "we are unwilling by judicial
decision to legislate such a requirement into [NEPA]").  This
court finds that the Ninth Circuit has not held that there is a
requirement to circulate a draft EA, and follows the opinions of
other circuits specifically holding that there is no such
requirement.  Biodiversity Conservation Alliance v. United States
Bureau of Land Mgmt., 404 F. Supp. 2d 212, 220 (D.D.C. 2005)
("BCA") ("A plain reading of the CEQ regulations reveals that an
agency is not expressly required to circulate a draft EA for
public comment before adopting its final decision, except in
limited circumstances that do not apply here." (citing 40 C.F.R.
§ 1501.4(e)(2))).

          Plaintiffs cite Weingardt for the proposition that an
agency must release "the functional equivalent of a draft EA."
Weingardt, 376 F. Supp. 2d at 992.  Discussing whether NEPA
requires circulation of a draft EA, the Judge Levi wrote:  "[t]he
way in which the information is provided is less important than

39

1  that a sufficient amount of environmental information--as much as

2  is practicable--be provided so that a member of the public can

3  weigh in on the significant decisions that the agency will make

4  in preparing the EA." Id. at 992.  However, "the agency can

5  never go wrong by releasing a draft EA." Id.  In Weingardt, the

6  FS issued an initial scoping notice for comment, but did not

7  allow comment on the final EA, prior to releasing a FONSI.  Id.

8  at 987.  Although Judge Levi found that the FS "failed to give

9  the public an adequate pre-decisional opportunity for informed

10  comment" because the documents the circulated pre-decisional

11  documents "contained no analysis of the environmental impacts of

12  the projects," Judge Levi chastised the FS for withholding

13  "already-prepared environmental documents even though the

14  documents were completed before the end of the public comment

15  period." Id. at 992.  Federal Defendants argue that the

16  Weingardt court's holding of a NEPA procedural violation was

17  based on this fact.  Although the Weingardt court was troubled by

18  the agency's failure to circulate already-prepared environmental

19  documents, the Weingardt court placed importance on informing the

20  public in some manner of "the various topics that the agency must

21  address in the EA, such as cumulative impacts, before the EA is

22  finalized." Id. at 992.

23          However, in preparing an EA, the regulations only

24  require that an "agency shall involve . . . the public, to the

25  extent practicable. . . ." 40 C.F.R. § 1501.4(b).  This court

26  agrees with the BCA court that "[d]etermining whether the public

27  was adequately involved is a fact-intensive inquiry made on a

28  case-by-case basis." BCA, 404 F. Supp. 2d at 220.  For the

following reasons, the court concludes that the FS adequately involved the public in this case.

The public was afforded not one, but two distinct comment periods in this case.  Although not required by NEPA or the CEQ regulations, the FS provided for a thirty-day comment period during the scoping process.[6] (AR 91-93.)  The FS provided another thirty-day comment period after the publication of the NOPA.  (AR 1716.)  Plaintiffs, concerned citizens, and experts took advantage of the two opportunities they were afforded to comment on the proposed action to provide thousands of comments.  (AR 1722, 1723-26, 1732-54, 1859, 1861-62.)  Contrary to plaintiffs' argument, small adjustments to the project between the scoping notice and the NOPA are of no legal consequence.  See BCA, 404 F. Supp. 2d at 220 (supplementation of the record "is only necessary when 'new information provides a seriously different picture of the environmental landscape'") (internal quotations omitted) (emphasis in original).  Moreover, plaintiffs have not identified any additional relevant information that they would have provided to the FS had there been another round of public review.  Oregon Nat. Res. Council v. Devlin, 776 F. Supp. 1440, 1446 (D. Or. 1991) ("A plaintiff must identify additional relevant information that would have been provided to the agency in order to succeed on a claim of failure to provide a public comment period." (citing Sabine River Auth. v. United States Dept. of Interior, 745 F. Supp. 388 (E.D. Tex. 1990))).

---

[6]     This follows FS's NEPA guidance (FSH 1909.15, Chapter 10, § 10.3), available at http://www.fs.fed.us/im/directives/fsh/1909.15/1909.15_10.doc.

1    Although the requirement in 40 C.F.R. § 1501.4(b) to

2  involve the public to the extent practicable offers differing

3  interpretations and the FS could have done more, the court is not

4  tasked with striking down an agency's policy that it may find

5  unwise, but determining whether the agency's action was

6  arbitrary, capricious, or otherwise not in accordance with the

7  law.  On this deferential standard of review and given the fact

8  that the court finds that the FS did not have to prepare an EIS

9  and the EA that the FS prepared was adequate, the court cannot

10 conclude that the FS's public involvement was arbitrary,

11 capricious, or otherwise not in accordance with law.  Therefore,

12 the court finds that the FS's involvement of the public fully

13 comported with NEPA.  Accordingly, the court denies plaintiffs'

14 motion for summary judgment and grants defendants' cross-motion

15 for summary judgment.

16    IT IS THEREFORE ORDERED that:

17    (1) Plaintiffs' motion to dismiss their claims with

18 prejudice under the Wilderness Act and the National Trails

19 Systems Act be, and the same hereby is, GRANTED;

20    (2) Federal Defendants' motion to strike portions and

21 exhibits of the Declaration of Jeffrey Erodes be, and the same

22 hereby is, DENIED;

23    (3) Plaintiffs' motion for summary judgement on their

24 NEPA and APA claims be, and the same hereby is, DENIED;

25    (4) Federal Defendants' cross-motion for summary

26 judgment be, and the same hereby is, GRANTED;

27 ///

28 ///

1         (5) This case is DISMISSED WITH PREJUDICE, and Judgment

2 shall be entered in favor of the defendants.

3 DATED:  September 4, 2007

4

5               _William V. Shubb_____

6             WILLIAM B. SHUBB
              UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28